KRAVITCH, Circuit Judge:

I. Introduction

This case involves a Fourteenth Amendment Equal Protection Clause challenge and a Section 2 Voting Rights Act (“VRA”) challenge to Florida’s felon disenfranchisement law which provides that “[n]o person convicted of a felony ... shall be qualified to vote or hold office until restoration of civil rights or removal of disability.”[1] Fla. Const, art. VI, § 4 (1968). The plaintiffs filed this class action on behalf of all Florida citizens who have been convicted of a felony and have completed all terms of their incarceration, probation, and parole but who are barred from voting under the *1217 state’s felon disenfranchisement law.[2] The defendants are members of Florida’s Clemency Board.[3]

II. Procedural History and Standard of Review

After cross motions for summary judgment, the district court granted summary judgment in favor of the defendants on all claims. A divided panel of this court reversed and remanded on both the Equal Protection and VRA claims. Johnson v. Governor of State of Florida, 353 F.3d 1287 (11th Cir.2003), vacated 377 F.3d 1163. This court vacated the panel opinion and granted a rehearing en banc. Johnson, 377 F.3d at 1163-64. We now consider whether the district court erred in granting summary judgment in favor of the defendants on the plaintiffs’ claims under the Equal Protection Clause of the Fourteenth Amendment and Section 2 of the Voting Rights Act.
We review a district court’s grant of summary judgment de novo, “viewing the record and drawing all reasonable inferences in the light most favorable to the non-moving party.” Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir.2002). Summary judgment is appropriate when “there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.” Fed.R.Civ.P. 56(c).

III. The Equal Protection Claim

The plaintiffs argue that Florida’s felon disenfranchisement law violates the Equal Protection Clause, which prohibits a state from “deny[ing] to any person within its jurisdiction the equal protection of the laws.” U.S. Const, amend. XIV, § 1. The plaintiffs contend that racial animus motivated the adoption of Florida’s criminal disenfranchisement provision in 1868 and this animus remains legally operative today, notwithstanding the fact that Florida altered and reenacted the provision in 1968.
A state’s decision to permanently disenfranchise convicted felons does not, in itself, constitute an Equal Protection violation. Richardson v. Ramirez, 418 U.S. 24, 53-55, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974). The Supreme Court made this clear in Richardson, where it rejected a non-racial equal protection clause challenge to California’s felon disenfranchisement law. 418 U.S. at 56, 94 S.Ct. 2655. In doing so, the Court relied on Section 2 of the Fourteenth Amendment, holding that it expressly permits states to disenfranchise convicted felons.[4] The Court was persuaded that:
[Tjhose who framed and adopted the Fourteenth Amendment could not have intended to prohibit outright in § 1 of that Amendment that which was expressly exempted from the lesser sanc *1218 tion of reduced representation imposed by § 2 of the Amendment.
Id. at 43, 94 S.Ct. 2655. Of course, the Equal Protection Clause prohibits a state from using a facially neutral law to intentionally discriminate on the basis of race. Washington v. Davis, 426 U.S. 229, 239-40, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). This includes a criminal disenfranchisement law enacted with the intent to deprive one racial group of its right to participate in the political process. Hunter v. Underwood, 471 U.S. 222, 233, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985). In light of this well-established precedent, the question here is whether the plaintiffs have alleged facts that, if true, would be sufficient to establish intentional discrimination in Florida’s current disenfranchisement law.
1. Historical Background
Florida’s policy of criminal disenfranchisement has a long history, tracing back well before the Civil War.[5] Florida’s earliest Constitution, adopted in 1838, authorized the General Assembly to enact criminal disenfranchisement laws and in 1845, Florida’s General Assembly enacted such a law.[6] Florida’s 1861 and 1865 Constitutions also contained criminal disenfranchisement provisions.
There is no doubt that Florida’s decision to adopt a criminal disenfranchisement law in these early Constitutions was based on a non-racial rationale. At that time, the right to vote was not extended to African-Americans, and, therefore, they could not have been the targets of any disenfranchisement law. The plaintiffs, however, point to 1868 as the critical date on which they allege Florida’s disenfranchisement law became motivated by racial discrimination.
Because the plaintiffs’ Equal Protection claim hinges on the 1868 criminal disenfranchisement provision, we must examine the historical context in which that provision was adopted. After the Civil War, the Reconstruction Act required Florida to ratify the Fourteenth Amendment and *1219 change its Constitution as a condition for readmittance to the Union.[7] In accordance with a, federally mandated plan, the South was divided into military districts with Florida under the command of General John Pope. Under his supervision, both African-Americans and white delegates were elected to Florida’s 1868 constitutional convention.
During the convention, a struggle for control erupted between the Radical Republicans and the Moderate Republicans. The Radical Republicans “wished to exclude native whites from state politics” and the Moderate Republicans were “opposed to the Radicals and willing to compromise with native whites.” After a series of events unfolded, the Radical Republicans and Moderate Republicans each had drafted competing constitutions and both groups claimed to be the lawful convention. The Federal government supervised the process. Faced with a choice between the two constitutions, the United States Congress endorsed the Constitution drafted by the Moderate Republicans. It was subsequently ratified by the voters of Florida. Like Florida’s earlier Constitutions, the 1868 Constitution contained a criminal disenfranchisement provision.[8] Thus, under federal supervision, a racially mixed delegation produced a constitution granting suffrage to men of all races.
We do not doubt that racial discrimination may have motivated certain other provisions in Florida’s 1868 Constitution such as a legislative apportionment scheme that diminished representation from densely populated black counties. The existence of racial discrimination behind some provisions of Florida’s 1868 Constitution does not, however, establish that racial animus motivated the criminal disenfranchisement provision, particularly given Florida’s longstanding tradition of criminal disenfranchisement. Indeed, the plaintiffs’ own historical expert conceded that prior to the instant case, no historian who had studied Florida’s 1868 Constitution had ever contemplated that the 1868 criminal disenfranchisement provision was enacted with discriminatory intent.
The plaintiffs offer no contemporaneous evidence from the 1868 constitutional convention demonstrating that racial discrimination motivated the enactment of the 1868 disenfranchisement provision. To advance their theory, the plaintiffs rely almost exclusively[9] on a few isolated remarks[10] made after the 1868 Constitutional Convention. Although these comments reflect an unfortunate and indefensible ra *1220 cial animus in nineteenth-century Florida politics, there is no evidence that these post-convention comments referenced the 1868 disenfranchisement provision. Indeed, the record strongly indicates that these comments referenced other provisions in the 1868 Constitution, such as the legislative apportionment system.[11] In addition, the plaintiffs point to the fact that Florida rejected the Radical Republican Constitution which did not contain a disenfranchisement provision in favor of the Moderate Republican Constitution which contained such a provision. Although this is true, it in no way establishes that racial discrimination motivated the disenfranchisement provision. There is no evidence to suggest that Florida’s decision to adopt the Moderate Republican Constitution had anything to do with the disenfranchisement provision.[12] Furthermore, Florida did not act alone in choosing its Constitution — the United States Congress expressly approved Florida’s 1868 Constitution in readmitting the state to the Union.
2. 1968 Constitutional Revision
One hundred years after the adoption of the 1868 Constitution, Florida comprehensively revised its Constitution. Once again, Florida chose to maintain a criminal disenfranchisement law, a decision explicitly left to its discretion by the text of the Fourteenth Amendment. The plaintiffs do not allege that racial discrimination motivated the adoption of Florida’s 1968 felon disenfranchisement law.
The backdrop for the enactment of Florida’s 1968 felon disenfranchisement provision is as follows. In 1965, the Florida Legislature appointed a thirty-seven member Constitutional Revision Commission (“CRC”) to engage in “a careful study of the constitution ... for the purpose of eliminating obsolete, conflicting and unnecessary provisions as well as for framing an orderly and properly arranged constitution, based upon economic and social changes.” 1965 Fla. Laws, ch. 65-561. To engage in this process, the CRC delegated responsibilities to various committees. The Suffrage and Elections Committee was charged with, inter alia, examining Florida’s felon disenfranchisement provision.
The plaintiffs contend that any revisions made in 1968 to Florida’s felon disenfranchisement law were not substantive in nature.[13] We disagree. Florida’s 1968 felon disenfranchisement provision is markedly *1221 different from Florida’s 1868 version. The 1868 Constitution (as amended in 1885) contained two provisions for criminal disenfranchisement.
Section 4 provided:
No person under guardianship, non compos mentis, or insane, shall be qualified to vote at any election, nor shall any person convicted of felony by a court of record be qualified to vote at any election unless restored to civil rights.
Fla. Const, art. VI, § 4 (1885). Section 5 provided:
The Legislature shall have the power to, and shall, enact the necessary laws to exclude ... from the right of suffrage, all persons convicted of bribery, perjury, larceny, or other infamous crime ...
Fla. Const, art. VI, § 5 (1885). After the 1968 revision, only one provision addressed felon disenfranchisement:
No person convicted of a felony, or adjudicated in this or any state to be mentally incompetent, shall be qualified to vote or hold office until restoration of civil rights or removal of disability.
Fla. Const, art. VI, § 4 (1968).
Whereas the 1868 provisions disenfranchised persons convicted of certain misdemeanors such as petty larceny,[14] under the new 1968 provision, only those persons convicted of felonies could be disenfranchised. Therefore, the 1968 provision narrowed the class of persons who could be disenfranchised and re-enfranchised some persons who previously were disenfranchised.[15]
Additionally, before submitting its proposal to the CRC, the Suffrage and Elections Committee considered several motions to alter the newly proposed felon disenfranchisement provision.[16] Notably, *1222 the committee considered but rejected an amendment which would have ended blanket disenfranchisement of felons and instead would have vested the legislature with the power to impose criminal disenfranchisement. The committee also considered and rejected an amendment to limit felon disenfranchisement to those still in prison. Had the committee only been engaged in stylistic revisions, as the plaintiffs urge was the case, it would not have considered or debated these alternatives.
The committee’s final proposal then was sent to the CRC. The CRC met to review the changes to the Constitution and submitted a draft to the legislature. The legislature approved the proposed new Constitution containing the disenfranchisement provision; it then was affirmed by the voters of Florida. Thus, Florida’s 1968 Constitution, including the felon disenfranchisement provision, was adopted after four stages of review.
3. Equal Protection Analysis
A facially-neutral law violates the Equal Protection Clause if adopted with the intent to discriminate against a racial group.[17] Washington v. Davis, 426 U.S. at 239, 96 S.Ct. 2040. In Hunter v. Underwood, the Supreme Court examined head-on an equal protection challenge to a criminal disenfranchisement provision. 471 U.S. at 223, 105 S.Ct. 1916. There, the Court determined that Alabama’s criminal disenfranchisement provision violated the Equal Protection Clause because it was adopted in 1901 to minimize the political power of its African-American population. Id. at 228-230, 105 S.Ct. 1916.[18] After the 1901 enactment, the Alabama legislature neither altered the provision nor reenacted it in a political atmosphere free of racial bias. Rather, all of the amendments to the provision were the result of judicial action. Id. at 233, 105 S.Ct. 1916.
The Hunter Court articulated a two-step test to analyze whether a criminal disenfranchisement provision violates the *1223 Equal Protection Clause. Id. at 227-28, 105 S.Ct. 1916. The Court directed as follows:
Presented with a neutral state law that produces disproportionate effects along racial lines, the Court of Appeals was correct in applying the approach of Arlington Heights to determine whether the law violates the Equal Protection Clause of the Fourteenth Amendment: “[0]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact ... Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.” Once racial discrimination is shown to have been a “substantial” or “motivating” factor behind enactment of the law, the burden shifts to the law’s defenders to demonstrate that the law would have been enacted without this factor.
Id. (citation omitted).
Thus, under the Hunter analysis, we first examine whether racial discrimination was a substantial or motivating factor in the state’s decision to deny the right to vote to felons. If there is evidence that racial discrimination was a motivating factor, we then ask whether the state can show that the provision would have been enacted in the absence of any racially discriminatory motive.
Applying Hunter v. Underwood
The essence of the plaintiffs’ Equal Protection claim is that racial animus motivated the adoption of Florida’s disenfranchisement law in 1868 and this animus remains legally operative today despite the re-enactment in 1968. As suggested earlier, we question whether the plaintiffs have adequately demonstrated that racial discrimination motivated the adoption of the 1868 provision. The plaintiffs introduced no contemporaneous evidence showing that racial discrimination motivated the adoption of the 1868 provision. Nevertheless, because of the procedural posture of this case, we are mindful of the need to view the evidence in the light most favorable to the plaintiffs. Thus, we will assume, without deciding, that racial animus motivated the adoption of Florida’s 1868 disenfranchisement law. That assumption does not, however, lead us to conclude that the plaintiffs satisfy the first step of Hunter. Importantly, we are concerned here with the validity of the 1968 provision, not the 1868 provision and the plaintiffs concede that the 1968 provision was not enacted with discriminatory intent.[19]
In Hunter, the Supreme Court left open the precise question we confront here: whether a subsequent legislative re-enactment can eliminate the taint from a law that was originally enacted with discriminatory intent.[20] Hunter, 471 U.S. at 233, 105 S.Ct. 1916. In Cotton v. Fordice, 157 F.3d 388 (5th Cir.1988), the Fifth Circuit recognized that this issue was left open by Hunter and held that the facially neutral disenfranchisement provision in that case overcame its “odious origin” through legislative amendments. 157 F.3d at 391. The Fifth Circuit pointed out that the disenfranchisement provision at issue was origi *1224 nally enacted in 1890 with discriminatory intent, but was amended by the legislature in 1950 to remove burglary as a disenfranchising crime, and was amended in 1968 to add murder and rape as disenfranchising crimes, two crimes which were historically excluded because they were not considered “black” crimes. Id. The court emphasized the deliberative process through which the provision had twice been amended: First, both houses of the legislature had to pass the amendment by a two-thirds vote; then the Mississippi Secretary of State had to publish the full text of the provision at least two weeks before the popular election; finally, a majority of the voters had to approve the full text of the provision. Id. Thus, the Fifth Circuit held that “[bjecause Mississippi’s procedure resulted both in 1950 and in 1968 in a reenactment of [the provision], each amendment superseded the previous provision and removed the discriminatory taint associated with the original version.” Id.
The situation here is similar to that in Cotton v. Fordice. Like Mississippi’s provision, Florida’s disenfranchisement provision was amended through a deliberative process in 1968. The 1968 provision narrowed the class of disenfranchised individuals to those convicted of felonies. Moreover, the provision first was considered by the Suffrage and Elections Committee. The Committee sent its final proposal to the CRC. The CRC reviewed the changes to the Constitution and sent a draft to the legislature, which approved the new Constitution. Finally, the voters approved the new Constitution. Thus, as in Cotton v. Fordice, Florida’s 1968 re-enactment eliminated any taint from the allegedly discriminatory 1868 provision, particularly in light of the passage of time and the fact that, at the time of the 1968 enactment, no one had ever alleged that the 1868 provision was motivated by racial animus.
Even if the plaintiffs were somehow able to satisfy the first step of Hunter, their Equal Protection claim would still fail. Under the second step of Hunter, we examine whether Florida would have chosen to disenfranchise felons in 1968 if legislators did not have a discriminatory motive. In Hunter, this was a more complicated analysis because it required a counter-factual scenario: given that Alabama only legislatively addressed the disenfranchisement issue once, what would legislators have done if they did not have a discriminatory motive? 471 U.S. at 228-29, 105 S.Ct. 1916. Here, we have the luxury of not having to delve into a complex counter-factual scenario because Florida simplified the analysis by returning to the issue in 1968. Florida’s 1968 Constitution permits us to determine whether the state would have chosen to disenfranchise felons if the impermissible motive was absent. The results are plain: there is no allegation of racial discrimination in 1968 and the legislators decided to include a felon disenfranchisement provision in the revised constitution after consideration by both the CRC and the Suffrage and Elections Committee. This decision was then affirmed by both houses of the legislature and by the voters of Florida.
Thus, Florida’s felon disenfranchisement provision is not a violation of the Equal Protection Clause under the standard the Court adopted in Hunter. Florida’s reenactment of the felon disenfranchisement provision in the 1968 Constitution conclusively demonstrates that the state would enact this provision even without an impermissible motive and did enact the provision without an impermissible motive. The state has met its burden as a matter of law by substantively reenacting the law for race-neutral reasons.
The plaintiffs urge that the defendants should bear a greater burden. They contend that Florida must affirmatively prove *1225 that racial discrimination was not a substantial or motivating factor behind the disenfranchisement law in 1968. Specifically, the plaintiffs argue that Florida must demonstrate that it acknowledged that racial discrimination tainted the 1868 provision, and yet it knowingly reenacted the disenfranchisement provision for non-discriminatory reasons in 1968. We do not require this level of proof.[21] Florida’s felon disenfranchisement provision is constitutional because it was substantively altered and reenacted in 1968 in the absence of any evidence of racial bias. Cotton v. Fordice, 157 F.3d 388 (5th Cir.1998).
The plaintiffs rely extensively on United States v. Fordice, 505 U.S. 717, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992) to support their argument. Fordice, however, dealt with a challenge to Mississippi’s system of higher education and involved an extreme case of recent state discrimination. Mississippi had actively resisted removing the segregated system of education in the 1960s, failed to fund even limited educational reform in 1969, and was sued by the United States and private plaintiffs in 1975 for failing to comply with the Equal Protection Clause.[22] Id. at 722-25, 112 S.Ct. 2727. The issue in Fordice was whether the state’s facially-neutral education system, adopted only after the state was required to integrate its schools by court order, was valid under the Equal Protection Clause if the system maintained the racially disparate impact that de jure segregation had created. The Supreme Court found that Mississippi’s actions were not consistent with the Equal Protection Clause because Mississippi made no effort to remove the discriminatory effects of de jure segregation.
The present case and Fordice are not analogous. First, Florida has a valid public policy reason for disenfranchising felons, where Mississippi did not have a sound justification for its education policies. Justice Thomas, in his concurring opinion in Fordice, specifically stated that heightened review is only applicable when there is no sound public policy justification for the state law, stating: “A challenged policy does not survive under the standard we announce today if it began during the prior de jure era, produces adverse impacts, and persists without sound educational justification.” Fordice, 505 U.S. at 746, 112 S.Ct. 2727. Unlike Mississippi, which did not have a valid educational justification for maintaining segregated schools, Florida has a legitimate reason for denying the vote to felons. Several courts have recognized the propriety of excluding felons from the franchise. See Richardson, 418 U.S. at 54-55, 94 S.Ct. 2655; Green v. Board of Elections, 380 F.2d 445, 450-52 (2d Cir.1967); Beacham v. Braterman, 300 F.Supp. 182, 184 (S.D.Fla.), aff'd, 396 U.S. 12, 90 S.Ct. 153, 24 L.Ed.2d 11 (1969).
Second, the current Florida provision was passed one hundred years after the alleged intentional discrimination occurred, *1226 whereas Mississippi’s provision was passed shortly after the end of de jure segregation in education. Needless to say, the Florida legislators who passed the 1868 Constitution and the 1968 Constitution were not the same people. In Fordice, however, the legislators who refused to desegregate the Mississippi schools without a court order in the 1960s, most likely overlapped significantly with the legislators who passed the facially neutral education system in the 1970s. Given the proximity in time between Mississippi’s intentional discrimination and the facially neutral provision in education, the Court had a healthy skepticism that the facially neutral provision was indeed neutral. Certainly, the Mississippi legislators who voted for the facially neutral provision understood the history of racial segregation in education and the likely effect of their new education system. But this skepticism does not apply here, because it is not reasonable to assign any impermissible motives held by the 1868 Florida legislators to the 1968 legislators who voted for the present felon disenfranchisement provision.
Third, Florida’s 1968 felon disenfranchisement provision did not continue the adverse disparate impact of earlier de jure measures, which makes the present case entirely different than the situation in Fordice. At the time the Mississippi legislature adopted its education system, the system of higher education was almost completely racially segregated. 505 U.S. at 722-23, 112 S.Ct. 2727. In Fordice, therefore, the Supreme Court was concerned that Mississippi was attempting to perpetuate its racially segregated education system, established in a time of de jure segregation, through a facially-neutral provision. Conversely, when Florida adopted its felon disenfranchisement provision in 1968, the racial effects of the provision were minor.[23] In 1968, Florida legislators and voters were not attempting to extend the effects of de jure discrimination with a facially-neutral provision because there was little adverse impact to extend by passing the felon disenfranchisement provision.[24] Florida’s provision simply did not maintain a pattern of discrimination the way Mississippi’s provision did. Consequently, the heightened review in Ford-ice is not appropriate here.
Finally, we note that this circuit has been reluctant to extend the education line of cases to other areas. As this court stated in Burton v. City of Belle Glade, school desegregation jurisprudence is unique and difficult to apply in other contexts. 178 F.3d 1175, 1190 (11th Cir.1999); see also Johnson v. DeSoto County Bd. Of Comm’rs, 204 F.3d 1335, 1344 n. 18 (11th Cir.2000). Moreover, as discussed earlier, there is specific precedent from this court and the Supreme Court dealing with criminal disenfranchisement. See Hunter v. Underwood, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985); Richardson v. Ramirez, 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974); Beacham v. Braterman, 300 F.Supp. 182, 183 (1969), aff'd 396 U.S. 12, 90 S.Ct. 153, 24 L.Ed.2d 11 (1969) (finding by a three judge panel that Florida’s decision to disenfranchise felons was not a violation of the plaintiffs equal protection or due process rights). Because these cases establish clear standards by which to judge state action, we are bound *1227 by precedent and need not go into other areas of possibly analogous law.
For the above reasons, we affirm the district court’s grant of summary judgment on this claim.

TV. The Voting Rights Act Claim

The plaintiffs also argue that Florida’s felon disenfranchisement law violates Section 2 of the Voting Rights Act. As a threshold matter, this claim raises an important question of statutory interpretation, namely, whether Section 2 of the Voting Rights Act applies to Florida’s felon disenfranchisement provision. The Circuits are split on this issue. Compare Muntaqim v. Coombe, 366 F.3d 102, 124 (2d Cir.2004) (holding that Section 2 did not reach New York’s felon disenfranchisement statute), cert. denied, — U.S. -, 125 S.Ct. 480, 160 L.Ed.2d 356 (2004), and reh’g en banc granted, 396 F.3d 95 (2004) with Farrakhan v. Washington, 338 F.3d 1009, 1014-15 (9th Cir.2003) (holding that Section 2 applied to Washington’s felon disenfranchisement law), cert. denied, — U.S. -, 125 S.Ct. 477, 160 L.Ed.2d 365 (2004); Wesley v. Collins, 791 F.2d 1255, 1259-61 (6th Cir.1986) (assuming that Section 2 of the VRA applies to felon disenfranchisement laws but holding that there was no violation); see also Farrakhan v. Washington, 359 F.3d 1116 (9th Cir.2004) (Kozinski, J., dissenting from denial of rehearing en banc) (arguing that Section 2 of the VRA does not apply to felon disenfranchisement laws).
1. The Scope of.the Voting Rights Act
Congress enacted the Voting Rights Act pursuant to its enforcement powers under the Fourteenth and Fifteenth Amendments for the remedial purpose of eliminating racially discriminatory voting practices. South Carolina v. Katzenbach, 383 U.S. 301, 308, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966); United States v. Marengo County Commission, 731 F.2d 1546, 1555 (11th Cir.1984). Recognizing the subtle ways that states often denied racial minorities the right to vote, in 1982, Congress amended Section 2 of the Voting Rights Act so that a plaintiff could establish a violation without proving discriminatory intent.[25] See Chisom v. Roemer, 501 U.S. 380, 383-84, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991). Thus, it is well-settled that a plaintiff can challenge voting qualifications under a “results” test.[26] Id. Section 2 of the Voting Rights Act of 1965, *1228 42 U.S.C. § 1973, as amended, provides in relevant part[27]:
(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color ...
(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that ... members [of protected racial minorities] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.
42 U.S.C. § 1973. Despite its broad language, Section 2 does not prohibit all voting restrictions that may have a racially disproportionate effect. See Chisom, 501 U.S. at 383, 111 S.Ct. 2354 (“Congress amended § 2 of the Voting Rights Act to make clear that certain practices and procedures that result in the denial or abridgement of the right to vote are forbidden even though the absence of proof of discriminatory intent protects them from constitutional challenge.”) (emphasis added); Muntaqim, 366 F.3d at 116. Felon disenfranchisement laws are unlike other voting qualifications. These laws are deeply rooted in this Nation’s history[28] and are a punitive device stemming from criminal law. See Richardson, 418 U.S. at 48-52, 94 S.Ct. 2655. Today, all states except two have some form of criminal disenfranchisement provision.
Most important, Florida’s discretion to deny the vote to convicted felons is fixed by the text of § 2 of the Fourteenth Amendment, which states:
[W]hen the right to vote ... is denied to any of the male inhabitants ... or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.
U.S. Const, amend. XIV, § 2 (emphasis added).[29] As the Court explained in Rich *1229 ardson, “the exclusion of felons from the vote has an affirmative sanction in section 2 of the Fourteenth Amendment, a sanction which was not present in the case of the other restrictions on the franchise which were invalidated [in other cases].” 418 U.S. at 54, 94 S.Ct. 2655. Thus, interpreting Section 2 of the Voting Rights Act to deny Florida the discretion to disenfranchise felons raises serious constitutional problems because such an interpretation allows a congressional statute to override the text of the Constitution.
It is a long-standing rule of statutory interpretation that federal courts should not construe a statute to create a constitutional question unless there is a clear statement from Congress endorsing this understanding.[30] As the Supreme Court stated in DeBartolo Corp. v. Florida Gulf Coast Trades Council:
[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress. This cardinal principle has its roots in Chief Justice Marshall’s opinion for the Court in Murray v. The Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804), and has for so long been applied by this Court that it is beyond debate ... This approach not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution. The courts will therefore not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it.
485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). Thus, when we analyze the scope of the Voting Rights Act, we should first address whether one interpretation presents grave constitutional questions whereas another interpretation would not, and then examine whether the latter interpretation is clearly contrary to Congressional intent. Id.
*1230 Here, the plaintiffs’ interpretation creates a serious constitutional question by interpreting the Voting Rights Act to conflict with the text of the Fourteenth Amendment.[31] The Fourteenth and Fifteenth Amendments to the United States Constitution grant Congress the power to enforce those amendments’ substantive provisions “by appropriate legislation.” U.S. Const. amend. XIV, § 5; XV, § 2. Congress may enforce the substantive provisions of these Amendments by regulating conduct that does not directly violate those Amendments. See South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). As the Court has explained, “Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct.” Nevada Dep’t of Human Resources v. Hibbs, 538 U.S. 721, 727-28, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003).
Nonetheless, Congress’s power in this regard is not absolute. To be a valid exercise of Congress’s enforcement power, “there must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.” City of Boerne v. Flores, 521 U.S. 507, 520, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Congress undoubtedly has the constitutional authority to prohibit many measures that are not explicitly prohibited by the Fourteenth Amendment, but this enforcement power arguably does not extend to prohibiting constitutionally protected practices. This is not to say that a state’s felon disenfranchisement provision can never be challenged. As the Court’s decision in Hunter made clear, states cannot use disenfranchisement provisions to discriminate intentionally on the basis of race. 471 U.S. at 233, 105 S.Ct. 1916. Thus, the plaintiffs have a remedy if the state’s provision violates the Equal Protection Clause. Id. It is a different matter, however, when a federal statute is read to limit a state’s delegated power.
Moreover, as the Second Circuit detailed in Muntaqim, there are additional reasons why the plaintiffs’ interpretation of the Voting Rights Act calls into question Congress’s enforcement power. 366 F.3d at *1231 118-26. For Congress to enact proper enforcement legislation, there must be a record of constitutional violations.[32] See Board of Trustees of University of Alabama v. Garrett, 531 U.S. 356, 368, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); Kimel v. Florida Bd. of Regents, 528 U.S. 62, 89, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). In Oregon v. Mitchell, 400 U.S. 112, 118, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970), superseded by U.S. Const. amend. XXVI, the Court reviewed the 1970 amendments to the Voting Rights Act, which imposed a temporary ban on literacy tests and lowered from 21 to 18 the minimum voting age. There, the Court affirmed the literacy test ban but held that Congress exceeded its authority in lowering the voting age from 21 to 18 in state elections. The Court concluded that “Congress had before it a long history of discriminatory use of literacy tests to disenfranchise voters on account of their race” but “Congress made no legislative findings that the 21 year old requirement was used by the States to disenfranchise voters on account of race.” Mitchell, 400 U.S. at 130, 132, 91 S.Ct. 260.
As was the case in Mitchell, when Congress enacted the VRA and its subsequent amendments, there was a complete absence of congressional findings that felon disenfranchisement laws were used to discriminate against minority voters.[33] Without a record of constitutional violations, applying Section 2 of the Voting Rights Act to Florida’s felon disenfranchisement law would force us to address whether Congress exceeded its enforcement powers under the Fourteenth and Fifteenth Amendments.[34]
*1232 For these reasons, we believe that the plaintiffs’ interpretation of the VRA raises grave constitutional concerns.[35] For the plaintiffs’ interpretation to be correct, we must look for a clear statement from Congress that it intended such a constitutionally-questionable result. DeBartolo, 485 U.S. at 575, 108 S.Ct. 1392. Instead of a clear statement from Congress indicating that the plaintiffs’ interpretation is correct, the legislative history indicates just the opposite — that Congress never intended the Voting Rights Act to reach felon disenfranchisement provisions.[36]
2. Congressional Statements in 1965
Congress first passed the Act in 1965 to prevent states from discriminating against minorities in voting. The act was intended to reach voting tests and other practices, such as districts designed by states to minimize minority voting. See Burton v. City of Belle Glade, 178 F.3d 1175, 1196 (11th Cir.1999). The Senate and House reports strongly suggest, however, that *1233 Congress did not intend Section 2 of the Voting Rights Act to cover felon disenfranchisement provisions.[37] These reports indicate that tests for literacy or good moral character should be scrutinized, but felon disenfranchisement provisions should not. S. Rep. 89-162, 1965 U.S.C.C.A.N. 2508, 2562. The only place where legislators addressed felon disenfranchisement was with regard to Section 4 of the VRA, where the Senate Report reflects that legislators intended to exempt the voting restrictions on felons from the statute’s coverage, stating:
The third type of test or device covered is any requirement of good moral character. This definition would not result in the proscription of the frequent requirement of States and political subdivisions that an applicant for voting or registration for voting be free of conviction of a felony or mental disability.
Id. Likewise, the House Report also states that the Voting Rights Act was not designed to reach felon disenfranchisement provisions:
This subsection does not proscribe a requirement of a State or any political subdivision of a State that an applicant for voting or registration for voting be free of conviction of a felony or mental disability.
H.R.Rep. No. 89-439, 1965 U.S.C.C.A.N. 2437, 2457. These reports indicate that neither house of Congress intended to include felon disenfranchisement within the statute’s scope. These are the only references to felon disenfranchisement made in reports to the 1965 act.
Furthermore, this court’s predecessor decided that the 1965 Act did not cover a state’s decision to exclude felons from voting. In United States v. Ward, the former Fifth Circuit held that the Voting Rights Act prohibited Louisiana from imposing any literacy test or other qualification on voter registration, but found that the act did not extend to felon disenfranchisement rules. 352 F.2d 329, 332 (5th Cir.1965).[38] There, the court issued an order enjoining the state from applying the voting tests, but explicitly exempted felony convictions from the order. The court ordered that the state cease
... requiring any applicant for voter registration in Madison Parish, as a precondition to such registration, to take or pass any test of literacy, knowledge, or understanding or to comply with any other test or device as defined in Section 4(c) of the Voting Rights Act of 1965, Public Law 89-110, 79 Stat. 438-439, i.e., any requirement (including the “good character” requirement specified in Article VIII, Section 1(c) of the Louisiana Constitution and Title 18, Section 32, of the Louisiana Code, except to the extent that these provisions permit disqualification for conviction of a felony).
Id. at 332 (emphasis added).
3. Congressional Statements in 1982
Congress most recently amended the Voting Rights Act in 1982 in response to the Supreme Court’s decision in City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 446 U.S. 55 (1980), in an attempt to clarify the standard for finding Section 2 violations. In revising the statute, Con *1234 gress intended to depart from the intent-based standard of the Supreme Court’s Equal Protection jurisprudence and establish an effects-based standard. S. Rep. 97-417, 15-17, 1982 U.S.C.C.A.N. 177, 192-94 (1982). After the 1982 amendment, a state practice could survive Equal Protection Clause scrutiny but fail Section 2 Voting Rights Act scrutiny.
Neither the plain text nor the legislative history of the 1982 amendment declares Congress’s intent to extend the Voting Rights Act to felon disenfranchisement provisions. The Senate Report, which details many discriminatory techniques used by certain jurisdictions, made no mention of felon disenfranchisement provisions.[39] Although it is conceivable that certain legislators may have wanted the Voting Rights Act to encompass felon disenfranchisement provisions, we should not assume that Congress intended to produce a statute contrary to the plain text of the Fourteenth Amendment without a clear statement. As the Second Circuit noted in Muntaqim, “considering the prevalence of felon disenfranchisement [provisions] in every region of the country since the Founding, it seems unfathomable that Congress would silently amend the Voting Rights Act in a way that would affect them.” 366 F.3d at 123-24. There is simply no discussion of felon disenfranchisement in the legislative history surrounding the 1982 amendments.
Thus, we believe that applying Section 2 of the Voting Rights Act to felon disenfranchisement provisions raises grave constitutional concerns.[40] Chiefly, the plaintiffs’ interpretation calls for a reading of the statute which would prohibit a practice that the Fourteenth Amendment permits Florida to maintain. As a matter of statutory construction, we should avoid such an interpretation. The case for rejecting the plaintiffs’ reading of the statute is particularly strong here, where Congress has expressed its intent to exclude felon disenfranchisement provisions from Voting Rights Act scrutiny. Accordingly, we affirm the district court’s grant of summary judgment to the defendants on the Voting Rights Act claim.

V. Wisdom of the Policy

Several amici curiae argue that, as a policy matter, felons should be enfranchised, particularly those who have served their sentences and presumably paid their debt to society. Even if we were to agree with the amici, this is a policy decision that the United States Constitution expressly gives to the state governments, not the federal courts. U.S. Const. Amend. XIV, § 2. Florida has legislatively reexamined this provision since 1868 and affirmed its *1235 decision to deny felons the right to vote. Federal courts cannot question the wisdom of this policy choice.

VI. Conclusion

For the foregoing reasons, we AFFIRM the district court’s grant of summary judgment in favor of the defendants.
AFFIRMED.

. The full text of the provision states:
No person convicted of a felony, or adjudicated in this or any other state to be mentally incompetent, shall be qualified to vote or hold office until restoration of civil rights or removal of disability.
Fla. Const, art. VI, § 4 (1968).
A felon who has completed his sentence may apply for clemency to have his civil rights restored. Fla. Stat. § 940 (2003). The plaintiffs also allege that Florida's voting rights restoration scheme violates constitutional and statutory prohibitions against poll taxes. Access to the franchise cannot be made to depend on an individual's financial resources. See Harper v. Va. State Bd. of Elections, 383 U.S. 663, 668, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). Under Florida's Rules of Executive Clemency, however, the *1217 right to vote can still be granted to felons who cannot afford to pay restitution. The requirement of a hearing is insufficient to support the plaintiffs’ claim. Because Florida does not deny access to the restoration of the franchise based on ability to pay, we affirm the district court's grant of summary judgment in favor of the defendants on these claims. In doing so, we say nothing about whether conditioning an application for clemency on paying restitution would be an invalid poll tax.

.Approximately seventy percent of the plaintiffs’ class is white.

. The Clemency Board is made up of the Governor of Florida and members of the Cabinet. The Clemency Board has the power to restore the civil rights of convicted felons, including the right to vote. See Fla. R. Exec. Clemency. The suit also named Florida's county supervisors of elections. Their participation has been abated pending determination of liability.

. The full text of Section 2 states:
Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding *1218 Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State. U.S. Const, amend. XIV, § 2.

. Indeed, throughout history, criminal disenfranchisement provisions have existed as a punitive device. See Harvard Law Review Association, One Person, No Vote: The Laws of Felon Disenfranchisement, 115 Harv. L. Rev. 1939, 1939-42 (2002). When the Fourteenth Amendment was ratified, twenty-nine of thirty-six states had some form of criminal disenfranchisement law. See Richardson, 418 U.S. at 48, 94 S.Ct. 2655. Today, forty-eight states have some form of criminal disenfranchisement provision. Although Florida’s felon disenfranchisement law may be among the most restrictive, Florida hardly stands alone in its long-standing use of these laws.

. The 1838 Constitution provided that "[t]he general assembly shall have power to exclude from ... the right of suffrage, all persons convicted of bribery, perjury, or other infamous crime.” Fla. Const, art VI, § 4 (1838).
The 1845 provision stated:
Be it further enacted, That every person who shall become a candidate for any of the foregoing offices, shall possess the same qualification as that prescribed for a voter, before he shall be eligible to that office. And no person who shall hereafter be convicted of bribery, perjury, or other infamous crime, shall be entitled to the right of suffrage.
1845 Fla. Laws. Ch. 38, art 2 § 3.

. In Richardson, the Court briefly explained the process of how the southern states gained readmission to the Union following the Civil War. 418 U.S. at 48-52, 94 S.Ct. 2655. The Court observed that many of the new congres-sionally approved state constitutions contained felon disenfranchisement provisions. Id.

. Notably, five African-American delegates at the convention explicitly voted for the 1868 criminal disenfranchisement provision.

. As further evidence of racial discrimination, the plaintiffs argue that the 1868 criminal disenfranchisement provision expanded the category of crimes by reaching all felonies. However, the plaintiffs conceded below that the term "infamous crimes” used in Florida’s 1838 disenfranchisement provision was understood at common law to include all felonies. The use of the word "felony” in the 1868 Constitution merely reflected the language that was used in the Reconstruction Act which required the states to grant suffrage to all male citizens, twenty-one years and older “except such as may he disenfranchised for participation in the rebellion or for felony at common law." Act of Mar. 2, 1867, ch. 163, 14 Stat. 428. § 5 (emphasis in original).

. For example, the plaintiffs cite to the fact that one of the Moderate Republican leaders stated in 1872 that he had kept Florida from becoming "niggerized.” A review of the record suggests that this post-convention com *1220 ment and others cited by the plaintiffs were likely made in reference to the legislative apportionment formula and a provision that circumvented local elections by requiring the governor to appoint county officials. The plaintiffs' own expert conceded that felon disenfranchisement was a relatively minor issue during the 1868 Convention.

. The only comment possibly referencing the felon disenfranchisement provision was made in 1881. But it is not clear whether this comment specifically referred to the adoption of the disenfranchisement provision in 1868. Moreover, we question the reliability of a single comment made thirteen years after the Convention.

. In fact, the record indicates that the reason the Moderate Republican Constitution was chosen was because it was signed by a clear majority of the delegates at the convention.

.To support this argument, the plaintiffs offer incomplete statements from a hodgepodge of legislative materials that were not before the district court at summary judgment. Even if we were to take judicial notice of all of these records, these materials would not help the plaintiffs. The plaintiffs also argue that the district court erred in excluding Richard Scher’s expert report on the 1968 constitutional revision. "We review evidentiary rulings for abuse of discretion, United States v. Smith, 231 F.3d 800, 807 (11th Cir.2000), and conclude that the district court did not abuse its discretion. Even if admissible, Scher's report would not help the plaintiffs.

. According to the Florida Supreme Court, persons convicted of offenses enumerated in Section 5 of the 1868 disenfranchisement provision, including a misdemeanor such as “petty larceny” were disenfranchised, State ex. rel. Jordan v. Buckman, 18 Fla. 267, 270 (1881).

. The plaintiffs focus on what they call the "automatic felony disenfranchisement provision” and assert that it remained unaffected by the 1968 revision. Presumably, the plaintiffs are referring to Section 4 of the 1868 provision. The plaintiffs’ argument is misleading. Section 5 of the 1868 provision was also an "automatic disenfranchisement” provision because it required the legislature to enact disenfranchisement laws. In deleting Section 5 in 1968, the legislature did engage in a revision of what the plaintiffs call "automatic disenfranchisement.” Therefore, the "automatic disenfranchisement provision” (which encompassed both sections 4 and 5 in the 1868 provision) was revised in 1968.

. The committee minutes state:
Mr. Earle moved that Article VI, Section 4 be adopted by the Committee on Suffrage and Elections. The motion was seconded. Mr. Pettigrew moved to amend Mr. Earle's motion by striking “judicially determined to be of unsound mind, or under judicial guardianship because of mental disability” and to substitute therefor "persons adjudicated mentally incompetent.” This motion was seconded and passed. Mr. Pettigrew moved to further amend Section 4 by adding to his previous amendment: "in this or any other state and who have not had their competency judicially restored.” This amendment was seconded and also passed. After considerable discussion, Mr. Petti-grew moved that Section 4 be deleted and the following inserted: "The Legislature may by law establish disqualifications for voting for mental incompetency or conviction of a felony.” The motion was seconded. Mr. Goodrich offered the following substitute motion to Mr. Pettigrew’s motion: Delete Section 4 and insert: "The Legislature may by law exclude persons from voting because of mental incompetence or commitment to a jail or penal institution.” After discussion, Mr. Goodrich's motion failed for lack of a second. The vote was taken on Mr. Pettigrew’s motion, but it failed of adoption. Mr. Goodrich moved that the word "felony” in line 2 of Section 4 be changed to "crime.” The motion failed for lack of a second. The *1222 Committee adopted Section 4 of Article VI with no further amendments.
Minutes of the Suffrage and Elections Committee of the Florida Constitution Revision Commission, Feb. 2-3, 1966, at 6-7.

. Proof of intentional discrimination is required under the Equal Protection Clause. One factor relevant to the intent inquiry is whether the law being challenged has an impact that bears more heavily on one race than another. See Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Here, Florida's felon disenfranchisement provision did not create a significant disparate impact along racial lines in 1968. Accepting the plaintiffs’ estimates for 1968 as true, the felon disenfranchisement provision denied voting rights to far more whites than African-Americans and decreased the percentage of African-American voters state-wide by less than one quarter of one percent. The plaintiffs’ best estimates show that 44,562 white voters and 16,150 black voters were disenfranchised in 1968 due to a felony conviction. Although proportionately more African-American voters were affected, the percentage of eligible African-American voters in the voting age public dropped only from 12.57% in 1967 to 12.32% in 1968. The plaintiffs focus on the present racially disparate impact of the felon disenfranchisement provision, but this amount of disparate impact was not present in 1968 when the provision was enacted. Although disturbing, the present racially disparate impact of the felon disenfranchisement law does not guide our analysis.

. Unlike the case at bar, in Hunter, there was extensive evidence that racial animus motivated the 1901 disenfranchisement provision. Alabama did not contest this fact. Indeed, at oral argument Alabama's counsel conceded that "I would be very blind and naive [to] try to come up and stand before this Court and say that race was not a factor in the enactment of Section 182; that race did not play a part in the decisions of those people who were at the constitutional convention *1223 of 1901 and I won’t do that.” Id. at 230, 105 S.Ct. 1916.

. There is no allegation in the plaintiffs’ complaint that the 1968 provision was adopted with the intent to discriminate based on race. Indeed, the plaintiffs stipulated that there is no evidence that legislators in 1968 were concerned with or considered the consequences of the policy along racial lines.

. The Supreme Court concluded that revision to the provision by state courts, which severed “some of the more blatantly discriminatory” portions of the law, did not purge the provision of its legislative intent. Hunter, 471 U.S. at 232-33, 105 S.Ct. 1916. The Supreme Court, however, did not hold that intervening legislative changes to the policy would have been legally insufficient to remove an earlier discriminatory intent;

. Prior to this case, no expert had ever suggested that the 1868 disenfranchisement provision was motivated by racial discrimination. The plaintiffs’ standard establishes an insurmountable burden. As the defendants point out, if the court were to accept the plaintiffs' standard, then the more dubious an allegation of past discrimination in a predecessor provision, the more difficult it becomes for a state to extinguish it because it would be unlikely that the present day legislators would be aware of the past discriminatibn. The result would be to reverse the presumption that a State’s laws are constitutional, and plunge federal courts into far-reaching expeditions regarding the sins of the past in order to question the laws of today.

. In Fordice, the question was one of what remedy the Constitution requires after a State has already been found liable for violating the Constitution via de jure segregation. By contrast, here the question is one of liability, not remedy.

. According to the plaintiffs' estimates, in 1968, 3.13% of voting age African-Americans were disenfranchised due to a felony conviction as compared to 1.24% of non African-Americans.

. In contrast to school desegregation where the racially disparate impact was at its height in the 1950s and 1960s and has decreased since, the felon disenfranchisement rale had very little racially disparate impact in the 1960s and only developed such an effect many years later.

. Specifically, Congress amended the Voting Rights Act in 1982 in response to the Supreme Court's holding in City of Mobile v. Bolden, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), which required proof of intentional discrimination to establish a violation under Section 2.

. Two types of discriminatory practices and procedures are covered by section 2: those that result in "vote denial” and those that result in "vote dilution.” The plaintiffs' claim here is one of vote denial. Vote denial occurs when a state employs a "standard, practice, or procedure” that results in the denial of the right to vote on account of race. 42 U.S.C. § 1973(a); Burton v. City of Belle Glade, 178 F.3d 1175, 1197-98 (11th Cir.1999). To prevail, a plaintiff must prove that "under the totality of the circumstances, ... the political processes ... are not equally open to participation by [members of a protected class] ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.” 42 U.S.C. § 1973(b). In making this inquiry, courts . consider a non-exclusive list of objective factors (the "Senate factors”) detailed in a Senate Report accompanying the 1982 amendments. See S.Rep. No. 97-417, at 28-29, 1998 U.S.C.C.A.N. at 206; Thornburg v. Gingles, 478 U.S. 30, 36, 106. S.Ct. 2752, 92 L.Ed.2d 25 (1986). Because we conclude that Section 2 of the Voting Rights Act does not reach Florida's felon disenfranchisement provision, there is no need to consider the plaintiffs' evidence of alleged discrimination in Florida’s criminal justice system which might be relevant under the totality of the circumstances inquiry.

.The full text, as amended in 1982, states:
(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered. Provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their participation in the population.
42 U.S.C. § 1973.

. When the Fourteenth Amendment was ratified, twenty-nine out of thirty-six states had some form of criminal disenfranchisement provision. Richardson, 418 U.S. at 48, 94 S.Ct. 2655. The prevalence of these laws before African-Americans were granted the right to vote indicates that states have historically maintained these laws for race-neutral reasons.

. The plaintiffs argue that the Fourteenth Amendment's endorsement of felon disenfranchisement laws should not control our analysis because the Fifteenth Amendment does not contain similar language and, in their view, *1229 the Fifteenth Amendment repealed § 2 of the Fourteenth Amendment. The plaintiffs cite to no case law to support this bold assertion and we find no merit in this argument. The plain text of the Constitution is clear and we must follow it.

. Before turning to a canon of statutory interpretation, we must find some level of ambiguity in the words of the statute. Dep’t of HUD v. Rucker, 535 U.S. 125, 134, 122 S.Ct. 1230, 152 L.Ed.2d 258 (2002); Harry v. Marchant, 291 F.3d 767, 770 (11th Cir.2002) (en banc). Although Section 2 of the VRA does not require proof of intentional discrimination behind the enactment of the challenged voting qualification, Congress's decision to retain the phrase “on account of race or color" makes it unclear as to whether Section 2 would apply to Florida’s felon disenfranchisement provision, which is endorsed by the Fourteenth Amendment, applies to felons without regard to race or color (it is particularly telling that over seventy percent of the plaintiffs' class is white), and is administered as one component of a felon's criminal sentence. See Muntaqim, 366 F.3d at 116; Nipper v. Smith, 39 F.3d 1494, 1515 (11th Cir.1994) ("to be actionable, a deprivation of a minority group’s right to equal participation in the political process must be on account of a classification, decision, or practice that depends on race or color, not on account of some other racially neutral cause.") (emphasis added). Moreover, the deep division among eminent judicial minds on this issue demonstrates that the text of Section 2 is unclear. See Muntaqim, 366 F.3d at 116-118 ("Unfortunately, it 'is exceedingly difficult to discern what [Section 2] means.' "). Finally, the interpretation of the statute advanced by the dissenters would suggest that currently incarcerated felons may also fall within the scope of the statute. Unless one concedes that Section 2 of the VRA reaches currently incarcerated felons, the interpretation advanced by the dissenters provides an additional reason why the statute is unclear.

. In saying this, we in no way doubt Congress's authority to enact the VRA nor do we question that, as a general rule, the results test of Section 2 is constitutionally sound. See United States v. Marengo County Comm’n, 731 F.2d 1546, 1556-63 (11th Cir.1984) (holding that Section 2's results test is constitutional on its face). The only issue here is our concern over whether Congress would exceed its authority if we were to apply Section 2 to Florida’s felon disenfranchisement law. Even assuming arguendo that Section 2 of the VRA applies to Florida's provision, a review of the record strongly suggests that the plaintiffs' Section 2 claim would still fail. The plaintiffs would have to demonstrate that specific and relevant racial biases in society interact with the felon disenfranchisement rule, resulting in a denial of the franchise "on account of race or color.” Cf. Thornburg v. Gingles, 478 U.S. 30, 47, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986) (stating that the Voting Rights Act requires that electoral practices interact with social or historical conditions to cause a racial inequality in the political process); Nipper v. Smith, 39 F.3d 1494, 1515 (11th Cir.1994) ("The existence of some form of racial discrimination remains the cornerstone of Section 2 claims ... ”). We are concerned only with how the state allegedly discriminates against similarly situated persons who have committed felonies. Although the record includes some evidence of a statistical difference in the rate of felony convictions along racial lines, these disparities do not demonstrate racial bias. There are a myriad of factors other than race that may explain the disparity. For example, an individual's socioeconomic status, prior criminal record, gravity of offense, strength of evidence, nature of legal representation, and age of offender might explain the disparity. Moreover, the plaintiffs’ own expert found that whites have disproportionately high conviction rates for four of the nine categories of crimes he analyzed. Furthermore, there is no significant racial disparity in the sentences received by convicts with similar guideline scores.

. As the Court has explained, Congress must (1) "identify conduct transgressing ... the substantive provisions” of the amendments and (2) "tailor its legislative scheme to remedying or preventing such conduct.” Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savs. Bank, 527 U.S. 627, 639, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999). In addition to the absence of findings showing that felon disenfranchisement laws are used to discriminate, it is also questionable whether applying Section 2 to reach all felon disenfranchisement laws would be a congruent and proportionate response to the purported problem with these laws. Section 2 applies nationwide to all states and there is no termination date. Given that racial minorities are overrepresented in the felon population, the plaintiffs’ theory would cast into doubt most felon disenfranchisement laws in this country. See Boerne, 521 U.S. at 533, 117 S.Ct. 2157 (noting that although enforcement legislation need not have "termination dates, geographic restrictions, or egregious predicates ... limitations of this kind tend to ensure Congress' means are proportionate to ends legitimate under” the Enforcement Clause).

. The plaintiffs suggest that it is unreasonable to require a specific record of violations because Congress could not identify every form of voting discrimination when it enacted the Voting Rights Act. Given the widespread existence of felon disenfranchisement laws throughout this Nation’s history and the fact that many States had such laws on their books when the VRA was enacted, we find no merit in this argument.

. The plaintiffs concede that Congress compiled no record of constitutional violations with respect to felon disenfranchisement provisions. They contend, however, that Congress’s enforcement power is broader when it acts to prohibit discrimination against a suspect class or to protect a fundamental right such as voting. See Tennessee v. Lane, 541 U.S. 509, 124 S.Ct. 1978, 1991-92, 158 L.Ed.2d 820 (2004) (court access); Hibbs, 538 U.S. at 735-36, 123 S.Ct. 1972 (sex). Although this is true, the Supreme Court still requires some record of constitutional violations to ensure that Congress had an adequate constitutional basis for prophylactic legislation. Hibbs, 538 U.S. at 735, 123 S.Ct. 1972; Lane, 124 S.Ct. at 1992. The plaintiffs also cite to the Court's decision in Hunter v. Underwood as evidence of a record of constitutional violations with regard to felon disenfranchisement provisions. A key problem with this argument is that the Court did not decide Hunter until 1985, three years after the 1982 amendments to the Voting Rights Act. Thus, Congress could not have relied on Hunter when it enacted the amended Section 2 of the Voting Rights Act. Moreover, evi *1232 dence of a purposefully discriminatory criminal disenfranchisement law in Alabama could not justify congressional regulation of Florida's law, which was enacted for race-neutral reasons.

. We also note that application of the VRA to Florida’s felon disenfranchisement provision could raise federalism concerns in that it significantly alters the constitutionally mandated balance of power between the States and the Federal Government. See Gregory v. Ashcroft, 501 U.S. 452, 457-61, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). Whenever Congress intrudes upon "a decision of the most fundamental sort for a [State], ... ‘it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides’ this balance.” Gregory v. Ashcroft, 501 U.S. at 461, 111 S.Ct. 2395 (quoting Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 243, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985)). Congress's intent must be "unmistakably clear in the language of the statute.” Id. at 460-61, 111 S.Ct. 2395. In Gregory, Missouri state court judges challenged a provision of the Missouri Constitution that required certain judges to retire at the age of seventy as being in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621-634 (ADEA). After concluding that "the authority of the people of the States to determine the qualifications of their most important government officials ... lies at the heart of representative government,” the Court found that state judges were not covered by the ADEA because Congress did not make their inclusion unmistakably clear. Id. at 467, 111 S.Ct. 2395. As in Gregory, the balance of power between the States and the Federal Government is at issue in this case. If defining the qualifications of important government officials lies at the heart of representative government, then surely defining who decides what those qualifications will be is equally important. Although the States’ power in this regard must be exercised in accordance with the Fourteenth and Fifteenth Amendments, § 2 of the Fourteenth amendment establishes an explicit constitutional balance between the States and the Federal Government by giving the States authority to continue the prevalent practice of disenfranchising felons. If Congress wishes to alter the balance of power in this area, its intention must be unmistakably clear.

. Only the Ninth Circuit has found a felon disenfranchisement provision to be a statutory violation. Fanakhan v. Washington, 338 F.3d 1009 (9th Cir.2003). There, the plaintiffs brought a Voting Rights Act challenge to the State of Washington's felon disenfranchisement provision, claiming that racism in the criminal justice system interacted with the state's suffrage laws to deny equal voting opportunities to minorities. Id. at 1020. The Ninth Circuit reversed the grant of summary judgment, but did not specifically address the constitutionality of its interpretation. Logically, that court must have found that the statute covered the challenged provision and that Congress had the constitutional authority to regulate felon disenfranchisement provisions to reach its holding. Nevertheless, the Ninth Circuit did not provide any reasoning for its finding, and thus that court's decision, which is only persuasive authority in our circuit, should not compel our analysis.

. We recognize that there is no legislative history directly referencing Section 2 of the VRA that mentions felon disenfranchisement provisions. Nonetheless, we find Congress's treatment of these provisions in reference to other sections of the VRA to be persuasive on this matter.

. In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

. The one-sided legislative history is buttressed by subsequent Congressional acts. Since 1982, Congress has enacted laws making it easier for states to disenfranchise felons. For instance, in 1993, Congress enacted the National Voter Registration Act (NVRA), Pub. L. No. 103-31, 107 Stat. 77 (1993), which authorizes states to purge felons from voter rolls. 42 U.S.C. § 1973gg-6(a)(3)(B). The Act also instructs federal prosecutors to give written notice to state election officials of persons convicted of felonies. 42 U.S.C. § 1973gg-6(g)(3). In this same Act, Congress sought to eliminate certain practices that dampen minority participation in the electoral process. Although not dispositive, this suggests that Congress did not intend to sweep felon disenfranchisement laws within the scope of the VRA.

. In addition to the constitutional concerns, there are prudential concerns as well. If we were to accept the plaintiffs’ interpretation of the statute, states might lose their ability to exclude felons currently in prison from the franchise. See Farrakhan, 359 F.3d at 1125— 27 (Kozinski, J., dissent from denial of rehearing en banc) (discussing the slippery slope problems of applying the Voting Rights Act to felon disenfranchisement provisions including implications for voter lists, Internet voting, and weekday elections).