Charles WESLEY and the Natural Rights Center, Plaintiffs-Appellants,

v.

David A. COLLINS, Coordinator of Elections and W.J. Michael Cody, Attorney General of Tennessee, Defendants-Appellees.

No. 85–5271.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 4, 1986.

Decided June 5, 1986.

Albert Bates, argued, Summertown, Tenn., for plaintiffs-appellants.

William P. Sizer, argued, W.J. Michael Cody, Nashville, Tenn., for defendants-appellees.

Before MARTIN and KRUPANSKY, Circuit Judges; and CHURCHILL, District Judge.*

KRUPANSKY, Circuit Judge.

Plaintiffs/appellants Charles Wesley and the Natural Rights Center appealed the district court order dismissing their civil rights action which challenged the validity of the Tennessee statute disenfranchising convicted felons.

The Natural Rights Center is a public interest law project active in civil rights. Charles Wesley is an adult black citizen of Tennessee who pleaded guilty to a charge of being an accessory after the fact to the crime of larceny and received a suspended sentence. The offense is defined as a felony in Tennessee and Wesley was thereby disenfranchised pursuant to T.C.A. 2–19–143, the Tennessee Voting Rights Act of 1981 (the Tennessee Act), which provides that any person who has been convicted of an infamous crime in Tennessee or convicted of a crime or offense in federal court or another state court which would constitute an infamous crime in Tennessee, shall not be permitted to register to vote or to vote in any election until pardoned or until his full rights of citizenship have been restored as prescribed by law.[1]

Plaintiffs commenced this action alleging that the Tennessee Act denied them rights secured under the Federal Voting Rights Act Amendments of 1982, 42 U.S.C. § 1973(a) and (b) (the Voting Rights Act) as well as under the Fourteenth and Fifteenth Amendments. Defendants moved to dismiss the complaint for failure to state a claim upon which relief could be granted. The district court granted defendants' motion, concluding that Tennessee's disenfranchisement of felons did not result in an unlawful dilution of the black vote in violation of the Voting Rights Act. The court similarly ruled that the Tennessee Act did not contravene the dictates of either the Fourteenth or Fifteenth Amendments. *Wesley, et al. v. Collins, et al.,* 605 F.Supp. 802 (M.D.Tenn.1985). The plaintiffs appealed.

A threshold issue confronting this court is the standing of the Natural Rights Center to initiate or to join the action as a real party in interest. The Supreme Court's recent decision in *Bender, et al. v. Williamsport Area School District, et al.,* — U.S. —, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986), counseled appellate courts to scrutinize pending actions for jurisdictional defects. "[E]very federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review.'" — U.S. at —, 106 S.Ct. at 1331 (quoting *Mitchell v. Maurer,* 293 U.S. 237, 244, 55 S.Ct. 162, 165, 79 L.Ed. 338 (1934)).

The question of standing derives from the language in Article III that "[t]he judicial Power shall extend to ... Cases ... [and] Controversies...." U.S. Const. art. III, § 2. Restrictions upon standing are necessary in order to guarantee that "the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." *Flast v. Cohen,* 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968). As the Court stated in *Duke Power Co. v. Carolina Environ. Study,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), "[t]he essence of the standing inquiry is whether the parties seeking to invoke the court's jurisdiction have alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." 438 U.S. at 72, 98 S.Ct. at 2631 (quoting *Baker v. Carr,* 369

---

* Hon. James P. Churchill, United States District Court for the Eastern District of Michigan, sitting by designation.

1. Restoration of the franchise is provided for by T.C.A. §§ 40–29–101, 102 and 103.

U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). The standing rule requires "not only a 'distinct and palpable injury' to the plaintiff.... but also a 'fairly traceable' causal connection between the claimed injury and the challenged conduct." *Duke Power Co., supra,* 438 U.S. at 72, 98 S.Ct. at 2629. *See also Young v. Klutznick,* 652 F.2d 617 (6th Cir.1981), *cert. denied sub nom., Young v. Baldrige,* 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 650 (1982).

■ Plaintiff Natural Rights Center argued[2] that its standing before this court derives from its position as a Tennessee public interest organization interested in securing a fair and equal electoral process. It contends that an injury to the voting rights of blacks results in an injury to the voting rights of all citizens of Tennessee, many of whom apparently number among its members. Assuming the validity of the alleged violations of the constitution and the Voting Rights Act, the Natural Rights Center has suffered no "distinct and palpable injury." *Duke Power, supra,* 438 U.S. at 72, 98 S.Ct. at 2629. At most, the Natural Rights Center's asserted injury "amounts only to a generalized grievance shared by a large number of citizens in a substantially equal measure," *id.* at 80, 98

S.Ct. at 2634, which is insufficient to support standing. *See United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974).

Nor is this a case where the Natural Rights Center attempts to vindicate the rights of others. *See, e.g., N.A.A.C.P. v. State of Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Plaintiff Charles Wesley was not one of its members. Moreover, any relief afforded to Wesley would inure to the benefit of all others who stand to be injured by the state's conduct, namely, black citizens of Tennessee convicted of felonies who have not been restored to the franchise. Thus, the Natural Rights Center has failed to prove that it has standing to participate in this action. The Natural Rights Center is accordingly dismissed with prejudice.

As previously noted, the Tennessee Act disenfranchises all persons who have been convicted of crimes which at the time of conviction were defined as infamous.[3] "Infamous crimes" are defined under the Tennessee Code as felony convictions. T.C.A. § 40–20–112. Accordingly, all convicted felons are disenfranchised in Tennessee until the franchise is restored.

2. In its opinion the district court did not address the propriety of the Natural Rights Center's presence in this lawsuit.

3. The Tennessee Voting Rights Act, T.C.A. § 2–19–143 provides:

**Suffrage for persons convicted of infamous crimes.**—The following provisions shall govern the exercise of the right of suffrage for those persons convicted of an infamous crime:

(1) No person who has been convicted of an infamous crime, as defined by § 40–20–112, in this state shall be permitted to register to vote or vote at any election unless he shall have been pardoned by the governor, or his full rights of citizenship have otherwise been restored as prescribed by law. Provided, however, the governor may attach to any such pardon a special condition that such person shall not have the right of suffrage until a date certain in the future, or until the expiration of the pardoned sentence, whichever period of time is less. (2) No person who has been convicted in federal court of a crime or offense which would constitute an infamous crime under the laws of this state, regardless of the sentence imposed, shall be allowed to

register to vote or vote at any election unless he shall have been pardoned or restored to the full rights of citizenship by the President of the United States, or his full rights of citizenship have otherwise been restored in accordance with federal law, or the law of this state. (3) No person who has been convicted in another state of a crime or offense which would constitute an infamous crime under the laws of this state, regardless of the sentence imposed, shall be allowed to register to vote or vote at any election in this state unless he shall have been pardoned or restored to the rights of citizenship by the governor or other appropriate authority of such other state, or his full rights of citizenship have otherwise been restored in accordance with the laws of such other state, or the law of this state. (4) The provisions of this section, relative to the forfeiture and restoration of the right of suffrage for those persons convicted of infamous crimes, shall also apply to those persons convicted of crimes prior to May 18, 1981, which are infamous crimes after May 18, 1981.

The plaintiff has charged that the Tennessee Act violates Section 3 of the Voting Rights Act Amendments of 1982. That section provides:

Sec. 3(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

(b) a violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

■ The Voting Rights Act secures not only the opportunity for all qualified citizens to cast their ballot, but also guarantees that an individual's vote will not be diluted. *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). While the Act, by its own terms, does not guarantee a group proportional representation, that class "does have a right to an opportunity, equal to that of other classes, to obtain such representation." *Butts v. City of New York,* 779 F.2d 141, 148 (2d Cir.1985).

■ Vote dilution occurs when a given class of individuals is effectively denied this opportunity. In *Gingles v. Edmisten,* 590 F.Supp. 345 (E.D.N.C.1984) (three judge court) *appeal pending,* — U.S. —, 105 S.Ct. 2137, 85 L.Ed.2d 495 (1985), the court explained the concept and essence of racial vote dilution:

[P]rimarily because of the interaction of substantial and persistent racial polarization in voting patterns (racial bloc voting) with a challenged electoral mechanism, a racial minority with distinctive group interests that are capable of aid or amelioration by government is effectively denied the political power to further those interests that numbers alone would presumptively give it in a voting constituency not racially polarized in its voting behavior. Vote dilution in this sense can exist notwithstanding the relative absence of structural barriers to exercise of the electoral franchise. It can be enhanced by other factors—cultural, political, social, economic—in which the racial minority is relatively disadvantaged and which further operate to diminish practical political effectiveness.

590 F.Supp. at 355 (citations omitted).[4]

Section 2 of the Voting Rights Act provides that a violation is established if, based upon the "totality of the circum-

**4.** Typical vote dilution situations under the Act were explained as follows:

In the context of elections for multi-member bodies, equal opportunity can be denied in a variety of ways. It would clearly violate the Act for a jurisdiction to promote class-based malapportionment by creating electoral districts with smaller populations in areas with majority voters, and with larger populations in areas with minority voters. An only slightly more subtle violation would be class-based gerrymandering: diluting the voting power of a minority area by splitting it into two or more electoral districts. A less obvious device is the use of at-large elections instead of single-member districts, which may have the effect of denying areas with large concentrations of minority voters the opportunity to pool their strength and elect members of their class from such areas.

*Butts v. City of New York, supra,* 779 F.2d at 148. *See also Ketchum v. Byrne,* 740 F.2d 1398, 1408 and n. 8 (7th Cir.1984) *cert. denied sub nom., City Council of Chicago v. Ketchum,* — U.S. —, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1984) (discussion of racial "packing" and "fracturing" in districting).

stances," the challenged legislation "results" in unlawful dilution. A review of the legislative history of the 1982 amendments teaches that the challenging party need not prove discriminatory intent to establish a violation:

> The amendment to the language of Section 2 is designed to make clear that plaintiffs need not prove a discriminatory purpose in the adoption or maintenance of the challenged system or practice in order to establish a violation. Plaintiffs must either prove such intent, or, alternatively, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process.

S.Rep. No. 205, 97th Cong. 2d Sess. 27, *reprinted in* 1982 U.S. Code Cong. & Ad. News 177 (hereafter "Senate Report").

The Senate Report cites to a number of factors, derived from decisions in *White v. Regester, supra,* and *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973) (en banc) *aff'd on other grounds sub nom., East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), to be applied by courts to determine if the challenged legislation violates Section 2.[5]

The determination of whether a plaintiff has proven that the challenged legislation results in vote dilution under Section 2 based on the "totality of the circumstances" requires a highly individualistic inquiry. The factors listed in the Senate Report are neither exclusive nor controlling. "To the extent that the enumerated factors are not factually relevant, they may be replaced or substituted by other, more meaningful factors," *Major v. Treen,* 574 F.Supp. 325 (E.D.La.1985) (three judge court). *See also* Senate Report at 29, n. 118 (factors not intended to be used as "mechanical 'point counting' device."). Moreover, even where the factors are found to be relevant, "[n]o formula for aggregating the factors applies in every case." *United States v. Marengo County Commission,* 731 F.2d 1546, 1574 (11th Cir.1984), *cert. denied and appeal dismissed,* — U.S. —, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984).

■ In the instant case, plaintiffs argue that the Tennessee Act disproportionately impacts on blacks because a significantly higher number of black Tennesseeans are convicted of felonies than whites. It is well-settled, however, that a showing of disproportionate racial impact alone does not establish a *per se* violation of the Vot-

---

5. The "typical factors" listed in the Senate Judiciary Report include, but are not limited to:

   1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

   2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

   3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

   4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

   5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

   6. whether political campaigns have been characterized by overt or subtle racial appeals;

   7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

   Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

   ■ whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

   ■ whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

   While these enumerated factors will often be the most relevant ones in some cases other factors will be indicative of the alleged dilution.

   Senate Report at 28–29.

ing Rights Act. Rather, such a showing merely directs the court's inquiry into the interaction of the challenged legislation "with those historical, social and political factors generally probative of dilution." *Gingles v. Edmisten, supra,* 590 F.Supp. at 354.

■ When the Tennessee law here in issue is viewed in the context of the "totality of the circumstances," it is apparent that the challenged legislation does not violate the Voting Rights Act. While the district court ascertained the presence in Tennessee of certain factors enumerated in the legislative history of Section 2, such as a history of racial discrimination, the effects of which continue to the present day,[6] such evidence of past discrimination "cannot, in the manner of original sin, condemn action that is not in itself unlawful." *City of Mobile v. Bolden,* 446 U.S. 55, 74, 100 S.Ct. 1490, 1503, 64 L.Ed.2d 47 (1980).

■ Moreover, the existence of other social and political factors present in this case leads to the inescapable conclusion that the Voting Rights Act was not violated. Chief among those factors was the state's legitimate and compelling rationale for enacting the statute here in issue. It is undisputed that a state may constitutionally disenfranchise convicted felons, *Richardson v. Ramirez,* 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974), and that the right of

felons to vote is not fundamental. *Owens v. Barnes,* 711 F.2d 25, 27 (3rd Cir.), *cert. denied,* 464 U.S. 963, 104 S.Ct. 400, 78 L.Ed.2d 341 (1983). Thus, courts have consistently recognized that states may, pursuant to section 2[7] of the Fourteenth Amendment, disenfranchise persons convicted of "participation in rebellion, or other crimes."[8]

In *Green v. Board of Elections of City of New York,* 380 F.2d 445, 451 (2d Cir. 1967) *cert. denied,* 389 U.S. 1048, 88 S.Ct. 768, 19 L.Ed.2d 840 (1968), the circuit discussed the rationale underlying a state's undisputed authority to disenfranchise felons:

> The early exclusion of felons from the franchise by many states could well have rested on Locke's concept, so influential at the time, that by entering into society every man "authorizes the society, or which is all one, the legislature thereof, to make laws for him as the public good of the society shall require, to the execution whereof his own assistance (as to his own decrees) is due." A man who breaks the laws he has authorized his agent to make for his own governance could fairly have been thought to have abandoned the right to participate in further administering the compact. On a less theoretical plane, it can scarcely be deemed unreasonable for a state to de-

---

6. *See, e.g., Geier v. Alexander,* 593 F.Supp. 1263 (M.D.Tenn.1984); *Kelley v. Metropolitan County Board of Education,* 615 F.Supp. 1139 (D.C. Tenn.1985).

7. Section 2 of the Fourteenth Amendment provides:

   Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial Officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age and citizens of the United States, or in any way abridged, *except for participation in rebellion, or other crime,* the basis of representation therein shall

   > be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

   (emphasis added).

8. *See, e.g., Richardson v. Ramirez,* 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974); *Shepherd v. Trevino,* 575 F.2d 1110 (5th Cir.1978) *cert. denied,* 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979); *Green v. Board of Elections,* 380 F.2d 445 (2d Cir.1967), *cert. denied,* 389 U.S. 1048, 88 S.Ct. 768, 19 L.Ed.2d 840 (1968); *Owens v. Barnes,* 711 F.2d 25 (3d Cir.) *cert. denied,* 464 U.S. 963, 104 S.Ct. 400, 78 L.Ed.2d 341 (1983); *Beacham v. Braterman,* 300 F.Supp. 182 (S.D. Fla.1969) *aff'd without opinion,* 396 U.S. 12, 90 S.Ct. 153, 24 L.Ed.2d 11 (1969); *Fincher v. Scott,* 352 F.Supp. 117 (M.D.N.C.1972), *aff'd without opinion,* 411 U.S. 961, 93 S.Ct. 2151, 36 L.Ed.2d 681 (1973).

cide that perpetrators of serious crimes shall not take part in electing the legislators who make the laws, the executives who enforce these, the prosecutors who must try them for further violations, or the judges who are to consider their cases. This is especially so when account is taken of the heavy incidence of recidivism and the prevalence of organized crime.

As *Green* emphasizes, the disenfranchisement of felons has never been viewed as a device by which a state could discriminatorily exclude a given racial minority from the polls.

Moreover, as the district court noted, the Tennessee Act does not deny any citizen, *ab initio*, the equal opportunity to participate in the political process and elect candidates of their choice. Rather, only the commission of a preascertained, proscribed act warrants the state of Tennessee to foreclose a certain individual from the voting process. Nor are felons disenfranchised because of an immutable characteristic, such as race, but rather because of their conscious decision to commit a criminal act for which they assume the risks of detention and punishment.

For these reasons, this court concludes that the disproportionate impact suffered by black Tennesseeans does not "result" from the state's qualification of the right to vote on account of race or color and thus the Tennessee Act does not violate the Voting Rights Act.

Plaintiff also asserts error to the district court for dismissing those causes of action in the complaint which alleged that the Tennessee Act violated the Fourteenth and Fifteenth Amendments.[9]

As noted previously, proof of intent or discriminatory purpose is not necessary to support a violation of the Voting Rights Act. However, a violation of the Equal Protection Clause of the Fourteenth Amendment is established only where there is proof of a racially discriminatory intent or purpose. *Village of Arlington Heights v. Metropolitan Housing Authority*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). A plaintiff need not prove that a discriminatory purpose was the sole reason for the action, only that discrimination was a motivating factor. *Id.* The challenged legislation must have been pursued "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable [racial] group." *Personel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979).

Once a plaintiff proves by a preponderance of the evidence that racial discrimination was a substantial or motivating factor in the adoption of the official action, the burden shifts to the state to prove by a preponderance of the evidence that the same decision would have resulted had the impermissible purpose not been considered. *Arlington Heights, supra,* 429 U.S. at 271 n. 21, 97 S.Ct. at 566, n. 21; *Hunter v. Underwood,* — U.S. —, 105 S.Ct. 1916, 1919, 85 L.Ed.2d 222 (1985).

Plaintiff contends that the district court's dismissal of his action prematurely foreclosed him from discovering and introducing evidence which may have disclosed that the Tennessee legislature's intent in enacting the disenfranchisement statute was to discriminate against blacks. However, plaintiffs were unable to present evidence that proved or inferred a discriminatory intent on the part of the Tennessee legislature.[10] It is clear that the further

---

**9.** Section 1 of the Fifteenth Amendment provides:

> The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

**10.** Plaintiffs' reliance on *Hunter v. Underwood, supra,* is misplaced. In *Underwood,* the Supreme Court struck down a 1901 Alabama dis-

enfranchisement statute as violative of the Fourteenth Amendment. *Underwood,* however, is materially distinguishable from the case at bar. First, the Alabama statute in *Underwood* disenfranchised persons convicted of certain felonies and misdemeanors and included crimes involving moral turpitude. Thus, that statute is far broader than the one here in issue. Second, it was conceded by the state in *Underwood* that

discovery requested by plaintiffs would be in the nature of a fishing expedition for unspecified evidence. Moreover, as the district court observed, it is axiomatic that a plaintiff unable to prevail under the far less stringent "results" test could not prevail under the more difficult intent standard.

For the foregoing reasons, the decision of the district court is hereby AFFIRMED.

the disenfranchisement of blacks played a major role in the statute's enactment as reflected by the record of the state convention at which the statute was signed into law. A review of the legislative debates surrounding the enactment of the challenged Tennessee statute, on the other hand, reveals no such intent to discriminate.